# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-30672

WATERFOWL LIMITED LIABILITY CO; LACASSANE COMPANY INC
Plaintiffs - Appellees

JARDIN MINERALS CO; BRUIERE MINERALS CO
Intervenor Plaintiffs - Appellees

v.

UNITED STATES OF AMERICA
Defendant - Intervenor Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana
(03-CV-587)

Before BARKSDALE, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

In a prior panel opinion, Waterfowl L.L.C. v. United States, 473 F.3d 135, 145 (5th Cir. 2006) ("Waterfowl I"), this court resolved the legal issues in this case and remanded it to the district court for "factual findings." On remand, the district court conducted a hearing and entered its factual findings. The Defendant-Appellant United States (the "Government") now timely appeals the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

district court's factual findings. Finding no clear error, we AFFIRM.

BACKGROUND

The prior panel opinion, Waterfowl I, 473 F.3d at 138-41, provides a summary of the factual and procedural background to this case. In short, the plaintiffs and intervenors owned mineral servitudes on land acquired by the United States. In 1984, the plaintiffs and intervenors sued the United States seeking a declaratory judgment that these servitudes had not been prescribed. The parties settled. As part of the settlement agreement completed in 1988, the United States recognized the servitudes were validly in existence. In exchange, the plaintiffs and intervenors carved mineral royalty, bonus, and rental rights out of the servitudes and conveyed them to the United States.

In 2003, the plaintiffs again sued the United States for a declaratory judgment claiming that "the government's mineral royalty on production from the [ ] servitudes had (with the exception of a forty-one acre tract . . .) prescribed in accordance with Louisiana law as a result of the lack of qualifying production for a period in excess of ten years [and] . . . that the mineral rights conveyed by the servitude owners to the United States had been extinguished by application of the Louisiana Mineral Code." Id. at 141. In response, the Government contended that federal common law applied and therefore Louisiana laws of prescription would not apply to its rights. Id. The district court entered judgment against the Government concluding that state law applied, or in the alternative, even if federal law applied, state law and not federal common law supplied the federal rule of decision. Id. The Government appealed, and this court rendered a decision in Waterfowl I.

In Waterfowl I, the prior panel determined that federal law governed the

settlement agreement; however, the previous panel held, the contractual language and parties' intentions would determine if state or federal common law supplied the federal rule of decision. Id. at 144. The prior panel concluded that state law would presumptively supply the federal rule of decision unless the Government had intended to "opt out" of the state regime. Thus, the previous panel stated: "[t]o avoid the application of state law, then, the government must show that it contracted around the Louisiana Mineral Code in the settlement agreement and act of conveyance to create a mineral royalty that is not prescriptible separately from the underlying servitudes." Id. The decision continues in footnote 9:

> [W]e must conclude that state law provides a default regime. Absent a relevant intervening change in state law,[1] state law is presumed to provide the operative federal rule of decision unless the parties opt out of it.

Id. at 144 n.9 (emphasis added). Finding the contractual language ambiguous, the prior panel remanded the case to the district court to resolve the factual question as to "which law the parties intended to govern the royalty." Id. at 145. Following a hearing on that issue, the district court found that the Government did not present any evidence that the parties intended to opt out of the Louisiana prescription regime and ruled for the plaintiffs. The Government appeals.

## STANDARD OF REVIEW

We review the district court's factual findings as to contractual intent under a clear error standard. Gebreyesus v. F.C. Schaffer & Associates, Inc., 204 F.3d 639, 642 (5th Cir. 2000).

---

[1] The Government concedes there is no change in law. See Appellant's Brief, at 50 ("Here, there was no change in law.").

## ANALYSIS

Under a "clear error" standard of review, we must presume, absent clear contrary evidence of intent, that the district court was correct in finding that the parties intended state law to supply the federal rule of decision. See Waterfowl I, 473 F.3d at 144 & n.9. The plaintiffs provided evidence to support the district court's factual finding that the parties had intended Louisiana law to apply as the federal rule of decision. For example, the plaintiffs' witness, Mr. Noble, the president of a company that was a party to the compromise negotiations, stated that it was his impression from his attorneys that the plaintiffs' intent was to have Louisiana law apply to the royalty interests. The plaintiffs also presented evidence that the lawyers representing the plaintiffs were Louisiana oil and gas law experts and that they used Louisiana royalty deed forms.

In order to prevail on appeal, the Government therefore has the burden of providing clear contrary evidence "show[ing] that it contracted around" or "opt[ed] out" of the Louisiana law as the adopted federal rule of decision. Id. The Government falls short of satisfying this burden. The Government presented the following evidence to show its intent to "opt out" of the Louisiana prescription regime. First, the Government relied on its only witness at the hearing -- a lawyer who worked on the settlement agreement. The witness, Mr. Harrington, stated that:

> There was never any discussion among the negotiating parties as to which law would govern the royalty interest. We never talked about whether the Mineral Code would apply. We didn't talk about whether the Mineral Code would not apply. We simply didn't mention the Mineral Code in any regard with respect to the revenue sharing issue.

The Government concedes in its brief that "when negotiating the Settlement, the

parties (and their predecessors) did not anticipate the present choice-of-law dispute, and did not adopt express terms to avoid it." This piece of evidence, at most, reflects the fact that both parties did not contemplate this choice-of-law issue during the contract negotiations.

The Government's other piece of evidence is a legal memorandum from the plaintiffs that was presented to the Government during settlement negotiations. It states that "the compromise is shaped so as to place the United States Government essentially in the same position it would occupy if it were the owner of one-half of the minerals or mineral rights. . . ." (emphasis added). The Government contends that the plaintiffs thereby intended the Government to act as permanent "owners" of the property rights, so they intended prescription not to run against the Government's rights.

There are many problems with this argument. First, the settlement memorandum only recommends placing the Government in a position "essentially as if" it was the owner. The plaintiffs did not promise to treat the Government as if it was the owner in all legal respects (particularly in respect to issues not contemplated by the parties). Second, the memorandum explicitly states that it was only a description of how the "compromise [wa]s shaped." Contrary to this explicit language, the Government now argues that the memorandum statements should act as a promise regarding an issue not contemplated nor discussed at all during the shaping of the compromise. Moreover, in the same memorandum, the plaintiffs clearly indicated that the memorandum should only be construed as a "frank and honest exposition" of the plaintiffs' claims and was provided solely within the context of ongoing discussions. Therefore, the memorandum stated that it should not be "construed as an admission against interest" nor as a final statement of both parties' intent.

Finally, the Government also presents evidence that the plaintiffs promised to treat the Government as a leaseholder during the same negotiations. Accepting arguendo the Government's argument regarding the "ownership" language in the plaintiffs' memorandum, the plaintiffs' promise to treat the Government as if it was a leaseholder of the property rights could also arguably imply the plaintiffs had intended the Government's rights to be of a limited duration, or, in other words, potentially subject to prescription. In its brief, the Government concedes that leases "are subject to term limitations similar (but not identical) to rules of prescription." (citing LA. REV. STAT. § 31:115). Therefore, even accepting arguendo the Government's arguments, the plaintiffs' alleged promises in these negotiation memoranda can be construed either to support the application of prescription or not.

In short, the Government presents no clear evidence that the plaintiffs promised to accord all the property rights concomitant with ownership, e.g., property rights that are not subject to prescription. See Chaney v. City of Galveston, 368 F.2d 774, 776 (5th Cir. 1966) ("Where the evidence would support a conclusion either way, a choice by the trial judge between two permissible views of the weight of evidence is not clearly erroneous, and the fact that the judge totally rejected an opposed view impeaches neither his impartiality nor the propriety of his conclusions."). Because the plaintiffs provided evidence to support the district court's factual finding and the Government failed to provide clear contrary evidence, the trial court did not clearly err in siding with the plaintiffs. See Otto Candies, LLC v. Nippon Kaiji Kyokai Corp., 346 F.3d 530, 533 (5th Cir. 2003) ("Under a clear error standard, this court will reverse only if, on the entire evidence, we are left with the definite and firm conviction that

a mistake has been made.") (internal citations and quotations omitted).

The Government's other legal arguments on appeal are foreclosed by Waterfowl I. Waterfowl I specifically limited further proceedings in this case to only the factual issue of the intent of parties as to the contracted choice-of-law because the contractual terms were ambiguous. Yet, in its brief, the Government continues to argue that because the contract included the term "forever," its royalty interest can not be prescribed. However, this court has already stated in Waterfowl I that "[b]ecause the term 'forever' in the granting clause cannot, therefore, bear its typical legal meaning, it is unclear what the parties intended the term to mean." 473 F.3d at 145. Barred by the "law of the case" doctrine, this panel cannot now conclude that the term "forever" now favors the Government's contractual interpretation. See Fuhrman v. Dretke, 442 F.3d 893, 896 (5th Cir. 2006) ("The law of the case doctrine provides that an issue of law or fact decided on appeal may not be reexamined . . . by the appellate court on a subsequent appeal.") (internal quotations omitted). The Government also argues that the application of the Louisiana prescription regime must be barred because it is "aberrant and hostile" to federal interests. However, again, this court in Waterfowl I stated that "the fact that cutting off the royalty right of the United States could diminish the amount of money flowing into its coffers is not a sufficient reason for refusing to borrow the prescription regime of the Louisiana Mineral Code as the rule of decision." 473 F.3d at 144. In other words, this court has already held that because no sufficient conflict with federal interests exists, the application of the Louisiana prescription regime to this case is not barred. Id.

Finally, the Government argues that because this case is clearly governed

by the federal common law rule of nullum tempus, the parties must have intended to consider the mineral rights as imprescriptible. The federal common law rule of nullum tempus is simply a public policy-based rule that "neither laches nor statutes of limitations will bar the sovereign." Block v. North Dakota ex rel. Bd. of Univ. and School Lands, 461 U.S. 273, 294 (1983) (O'Connor, J., dissenting). However, the Government already argued the applicability of nullum tempus to this case in the previous appeal. The previous panel implicitly rejected this nullum tempus argument, because it held that the Louisiana prescription regime could apply as a matter of law – the only factual question remaining for further proceedings was whether the parties intended the Louisiana prescription regime to apply. Waterfowl I, 473 F.3d at 145 ("They might have intended for the royalty to last as long as the underlying servitudes, or they might have merely meant that whatever rights conveyed in the settlement agreement were not subject to any time constraint . . ."). Any argument before this panel that nullum tempus applies as a matter of law and thereby bars the application of the Louisiana prescription regime to this contract is now foreclosed by the "law of the case" doctrine. "[E]ven when issues have not been expressly addressed in a prior decision, if those matters were 'fully briefed to the appellate court and . . . necessary predicates to the [court's] ability to address the issue or issues specifically discussed, [those issues] are deemed to have been decided tacitly or implicitly, and their disposition is law of the case.'" Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am., 272 F.3d 276, 279 (5th Cir. 2001) (quoting In re Felt, 255 F.3d 220, 225 (5th Cir. 2001)).

## CONCLUSION

We do not find any clear error in the district court's factual determination. Accordingly, we AFFIRM the judgment of the district court.